110-3274, Richard Olcikas v. Dominic Spak, please. Good afternoon, Your Honors. If it may please the Court, Counsel, my name is Kevin Bickel. I represent Mr. Richard Olcikas, the plaintiff appellant in this matter. I want to focus this Court's attention specifically to the Commission's finding of a lack of causal connection and the other two issues raised in the appeal. I will just rely on my brief. Just as a general background, Your Honors, this case was sort of derailed right from the get-go when Arbitrator Puglia originally found a lack of causal connection based on her mistaken and erroneous reliance on a typographical error that was contained in the July 7, 2003 Dr. Brecker note where the plaintiff had indicated that his injury hurts on the jog, which she interpreted to mean that the plaintiff was a jogger and that the torn meniscus that he eventually, that the MRI showed that he had suffered was due to those jogging activities. The Commission affirmed the arbitrator's decision, but on a different basis, and they recognized the mistake that was made by Arbitrator Puglia. However, the doubt that was placed in this case and has permeated since that there's an intervening or subsequent injury during a gap in treatment has maintained. And I'll get to the gap in treatment just here in a second. The pivot point of this case, Your Honors, is that last visit with Dr. McConnell, the plaintiff's treating physician, on August 27, 2002. The Commission has concluded that as of that date, he had reached maximum medical improvement. As this Court's aware, maximum medical improvement does not occur until there's a stabilization of the injury or the employee has recovered as far as the permanent character of the injury will permit. I would submit to this Court that there's nothing in this record that would support that conclusion. And, in fact, every piece of evidence in this record except for the respondent's retained physician's opinion actually contradicts that conclusion. Specifically, the medical record, which can be found on page 280 to 282 in the transcript, sets forth that the plaintiff was nowhere near maximum medical improvement. He showed up for a further evaluation of his left medial knee pain. He complained about more left medial knee pain. He wondered if he should... What did Dr. Reicher say? He confirmed what the plaintiff was saying about his injury. It's causally connected to the May 6, 2002 accident. Did he say it was possible that the municipal care care was a degenerative condition rather than a work-related issue? He said in a hypothetical it was, but in this case he did not believe there was any evidence establishing that. And that's further proven by the plaintiff's own testimony in which he said that he never suffered any left knee injury or symptoms prior to the date of the accident as well as at any time after the date of the accident. Counsel, the commission specifically found that they believed that Dr. Kahle's opinions and testimony were more persuasive than Dr. Reicher, correct? True. And why can't they do that? They can do that, Your Honor. What I'm asking this Court to do is look at his conclusions, look at the unsupport of his conclusions in the record, and rule that it's against the manifest way to the evidence. Again, getting back to this August 27, 2002 and Dr. Kahle's conclusion of maximum medical improvement, it's significant that the plaintiff's own treating doctor at that time, Dr. McConnell, changed his plan of care. He restarted the pain medication, Vioxx. He ordered the plaintiff to start putting ice packs on the medial aspect of his knee, and he actually ordered him to follow up two weeks later for further care. There's simply no evidence in the record here that would support Dr. Kahle's conclusion that he was at maximum medical improvement when his own doctor at that time said, hey, come back in two weeks. We'll continue treating for this. It's also important to point out that Dr. Kahle even admitted that the history given on that August 27, 2002 date was not of a man who no longer had symptoms. So he essentially admitted in his own testimony that he probably wasn't at maximum medical improvement. Despite the plaintiff's complaints of pain, the clear and obvious nature of his symptom was on that date, and even his own treating physician's orders on that date, the defendant from that point on refused any further treatment. September 9th was the date that he was ordered to follow up. The plaintiff testified that he showed up to the doctor's office at the front door. He was denied, and they said, sorry, this visit's not been approved. There's clear evidence in the record that from August 27, 2002 through May of 2003, he made multiple requests to a defendant employee at Joseph Reformata about getting additional treatment, that he was still having problems with this. Again, it was denied. There are documents in the record establishing and corroborating the plaintiff's testimony in this regard. There's an e-mail from December 2002 which indicates that the plaintiff had requested further authorization to see an orthopedic surgeon by the name of Dr. Hennessy, but it was denied. The official denial even came in March 2003, which in my mind indicates that there was enough complaints and enough requests that they felt the need to actually respond in writing, saying any further treatment on this matter is no longer approved. The most significant complaint occurred in May 5th of 2003 when the plaintiff was treating with Dr. McConnell for a subsequent unrelated injury, rupture of his right biceps. During a follow-up on May 5th, 2003, he again noted the left pain that he was experiencing, and he related it back to the original accident. But the doctor, for whatever reason, decided to ignore that, and he said he wanted to focus on that new injury. The commission, this was the second significant basis that the commission relied upon in finding no causal connection, was that he didn't make any further complaints in May of 2003. But the record is absolutely clear that he did. It's right there in the medical notes. Despite all of these claims, these continued complaints, rather, the plaintiff was not treated again for his injury until July 9th of 2003 when he visited an orthopedic surgeon, Dr. Alan Brecker, again for the right biceps rupture, which was unrelated. He again complained about left medial pain in his knee. I told him his history about the mechanism of the injury that occurred and how it occurred. Immediately, the orthopedic surgeon decided, hey, this sounds like a meniscus tear. Let's get an MRI. Ten days later, the MRI was ordered and found a meniscal tear. Essentially, what the defendant is relying upon and what the commission has concluded is that there's this gap in treatment from August 27th, 2002, to July 9th of 2003, and that because of that gap, there's no evidence that the plaintiff essentially was at an MMI back in August 27th, 2002. Are you arguing the gap has caused because the lawyer refused to authorize further treatment? Absolutely. Absolutely. That is the biggest issue. One of the biggest issues in this case, Your Honor, is that essentially if we allow this decision to go through, we're setting a precedent that I don't think this Court wants to accept, which is that a defendant employer can wrongfully and unlawfully deny treatment to one of its employees and then later justify and try to validate that denial by saying, hey, he didn't get any treatment, you know, during that period of time. He didn't exhibit any symptoms, so apparently there's no causal connection. That's exactly what Commissioner Sherman found in her dissenting opinion where she said, quote, I find it disturbing that defendant has been permitted to benefit by its unlawful denial of treatment by successfully arguing that the absence of such treatment proves an absence of ongoing symptomatology to support a finding plaque causation. That's exactly what's happened in this case. And as such, I would submit that this gap in treatment has absolutely no bearing on the issue of causal connection. Lastly, Your Honors, there's the other conclusions that are made by Dr. Kale, again, the respondent's retained physician that the Commission adopted that were also against the manifesto weight of the evidence. Specifically, he's concluded that there's, quote, no evidence of a meniscal tear, end quote, from the date of the accident of May 6, 2002 until his last treatment date with Dr. McConnell on August 27, 2002. This is, again, refuted by not only the plaintiff's testimony concerning his injury, Dr. Brecker, his orthopedic surgeon's conclusions, causal connection, but also Dr. Kale's own testimony is inconsistent on this matter, because he agreed the plaintiff had injured his knee on the date of the accident. He agreed that the mechanism of the injury is the type that can cause a torn medial meniscus. He agreed that the plaintiff's complaints of medial knee pain and a finding of mild swelling all the way back in May 2002, the original treatment date, were indications of a tear. He also agreed that the plaintiff could alleviate his symptoms simply by favoring his knee or working more light duty activities, which the plaintiff testified he did. It's significant to note that Dr. Kale, in his first report in April 2007, which is four or five years after the accident and his initial treatment, actually conceded the issue of causal connection when he stated that the, while looking at him for multiple injuries, he said these were four work-related injuries. A year later, after being informed by defendant's counsel that the plaintiff was now seeking surgery, he changed his opinion to no causal connection. I think it's also important to note that Dr. Brecker, who was the first orthopedic doctor that he saw, he was presented with the exact same complaints of pain to the medial aspect of the left knee. He immediately suspected a tear. He ordered the MRI, and it confirmed the tear, which leads me to believe that had the MRI been done back in 2002, when the plaintiff was requesting further treatment, it would have found the tear as well. In closing, there's nothing in the record that supports the commission's conclusion as to causal connection. If anything, all of the evidence contradicts that. And so we're seeking a reversal of the commission's decision and a finding that the injury was causally connected and that the defendant should be ordered to pay for his prospective medical treatment. Counsel, please. Good afternoon, Your Honors. May it please the court, counsel. I respect counsel's argument. I would submit to you that, and basically he admits that in order for you to make any change in this decision, it's purely a question of fact. You must find that you are going to interpose your judgment for the judgment of the commission on the question of which doctor, because this is not a, it's funny how you wind up with two cases in the afternoon, and they're both left knee injuries. But you've got two doctors with competing opinions, and the commission has to choose one, and they have chosen one. And the commission is also given the responsibility for determining the credibility of the claimant. The arbitrator is given the responsibility for determining credibility. And when you look at the arbitrator's decision, she found the petitioner not to be credible, and not simply because of an error in one of the notes of the doctor. But she wrote an 11-page decision carefully analyzing all of the evidence and reaching the conclusion that the claimant wasn't credible. What about the gap in the treatment being attributed to the company denying the payments? You know, that's such a specious argument. And the arbitrator actually wrote a paragraph as to why she didn't believe the petitioner was credible. And basically what she said, and I'm parroting what she said because I've got other arguments I can make, is, you know, it's incredible for me to believe that the man says he couldn't get any medical treatment, and that's why he didn't treat over the year. Because what I believe, this is the arbitrator talking, is what I believe is he really didn't have that many complaints. And the reason I say that as the arbitrator is because when he went to see Dr. Brecker in July 2003, he told the doctor about the alleged injury, and he received treatment. Now, he says, I didn't get treatment for a year because you wouldn't authorize it. Well, we didn't authorize it in July 2003, and yet you received treatment. So it's specious to say, oh, I couldn't go see a doctor when you, in fact, went and saw a doctor and you got treatment even though you hadn't been authorized for treatment. And the truth is, at any point in time, he could have seen a doctor and he could have gotten some treatment, you know, how he pursued it. But, you know, perhaps the thing that you have to go back to, it's one of the main things the commission relies on, is the initial treating medical records from Dr. McConnell and recognize that this was a minor injury. This wasn't an injury which caused a day of lost time. The man continued to perform work. It was a minor knee strain. He saw Dr. McConnell for a few visits in May of 2002, and then after a couple of months he went back and saw Dr. McConnell in August 2002. And counsel argues, well, you know, that shows that he had a medial meniscus tear. And the thing that you have to do is you look at Dr. McConnell's record from May of 2002 and August 2002, and the physical findings are what you're looking at to determine whether or not there's a medial meniscus tear, and it's not there. You know, the doctor didn't exam, but you look at the examination, full range of motion, no effusion, no crepitus, no evidence of ligament tearing or laxity in a normal gait. You know, what the doctors are looking for in terms of seeing whether or not you've got an acute medial meniscus tear is there a positive McMurray sign. There wasn't. I mean, there's no physical findings to justify the conclusion that he had a medial meniscus tear as a result of the May 2002 accident. In fact, and this is one of the things that Dr. Kale relied on, is the area where the man had complaints, yeah, it was in the knee, but it wasn't in the part of the knee where you'd have the medial meniscus tear. It's in a slightly different part of the knee. And it's not that Dr. Kale said, you know, the man didn't have an injury to his left knee. What he's saying is from the accident of May 2002, based on my review of the medical records, he was at MMI as of August 2002. And there's no reason to say that, well, you know, the employer didn't authorize care and therefore he couldn't get any care. I mean, that's just, you know, the man had a host of other accidents or injuries as demonstrated in the record. And I think what the case boils down to is it boils down to a finding of fact. The arbitrator had a perfect opportunity to evaluate the credibility of the claimant as well as review the medical records and the medical reports. She reached a conclusion as to what factual findings to adopt, as did the commission. And the, you know, obviously before it got here, the case went to the circuit court and the circuit judge wrote a fine analysis, probably better than our brief, as to the case law, as to the standard of review, and as to the fact that this is a question that was uniquely in the province of the commission and their determination shouldn't be upset unless there's no evidence to support it. And there is evidence to support it in the medical records and in the medical report of Dr. Kale. Thank you, gentlemen. Your Honor, counsel indicated that this is an issue regarding competing opinions of two doctors. I would submit that that is not the case here. It's the entire evidentiary record compared to one doctor's opinion, a doctor that didn't see the patient until five years later, didn't review his medical records until five years later, and in fact changed his opinion based on this very important issue of causal connection as soon as he figured out the defendant was going to have to pay for surgery. Again, this is a precedent that I don't think this Court should accept, that the defendant can unlawfully deny treatment to a plaintiff that clearly has symptoms that are ongoing, that are clearly not reaching the point of maximum medical improvement, and then later be able to look back in history and say, well, he didn't get any treatment, so he apparently doesn't have any symptoms, so there's no causal connection. Counsel also brought up the arbitrator's ruling, which, based on the credibility of the plaintiff, but again, almost her entire conclusion is based on this wrong typographical error about jogging, which the commission, in their opinion, straightaway said that that's not right. She made a mistake. She also made mistakes, just like the commission did, that he didn't make complaints during the time of this, quote-unquote, gap of treatment. We admit there is a gap of treatment, but it was caused by the defendant's refusal to authorize treatment. There is not a gap of complaints or symptoms, which would somehow negate causal connection in this case. As to counsel's claim, too, that he had the right or the ability to go seek other treatment, again, this gets back to the issue of he is now being placed with a burden to exercise as much as he can to go out and get treatment, even though, in this case, his employer, under the workers' compensation system, should have approved his treatment, that his own insurance company denied the claim because it was a work-related injury. And so now he has to go and spend his own money, you know, because the defendant initially had already denied treatment. That's just not right. Again, to Dr. Kale, I think his credibility is at issue, though I don't know that this Court can review that, and I agree that that is the commission's province. However, all of the conclusions that are made by Dr. Kale are not supported in the record. They are all against the manifest weight of the evidence, and that's the basis for reversing this decision. Thank you. Thank you, counsel. Of course, we'll take the matter under advisement for disposition.